# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| **ALLISON KAINER-CARGILE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No: 11 cv 7435** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cole** |
| **CAROLYN COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Allison Kainer-Cargile, is appealing a decision by the Commissioner that she received an overpayment of disability benefits for which she was "not without fault." Ms. Kainer-Cargileainer-Cargile asks for a remand of this case back to the Commissioner, and the Commissioner asks that her decision be affirmed.

Ms. Kainer-Cargile is deaf, and she was apparently receiving child's benefits based on her father's earnings record and supplemental security income based on her own account, stemming from applications she filed in 1997 and 1998. She began receiving benefits shortly after that. (Administrative Record (R.), 30-40). Ms. Kainer-Cargile started working in 2000, earning between $5,814 in 2000, and $23,214 in 2004. Her average salary during that period was about $16,420 a year. (R. 67). By written notice, she was informed on November 20, 2006, that her benefits were terminated, that she had been overpaid during that period by $66,535, and that she had to pay it back. (R. 47). Ms. Kainer-Cargile filed a request for a waiver of repayment, but was denied. She then requested a hearing. (R. 51-60, 86-91).

On January 9, 2008, an administrative law judge ("ALJ") convened a hearing, at which Ms. Kainer-Cargile, her husband, and a friend appeared and testified. Ms. Kainer-Cargile was not represented by counsel (R. 115), but a sign-language interpreter was provided for her. (R. 112-144). On January 25, 2008, the ALJ issued a decision finding that Ms. Kainer-Cargile was not without fault in receiving and accepting the overpayment and recovery was not waived. (R. 9-11). This became the final decision of the Commissioner when the Appeals Council denied the request for review of the decision on June 16, 2011. (R. 3-5). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Kainer-Cargile has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I.
## BACKGROUND

### A.
### Ms. Kainer-Cargile's Contacts with the Social Security Administration

The record includes the transcripts of telephone calls Ms. Kainer-Cargile made to the Social Security offices. Being deaf, she made the calls with a TTD system. The transcripted first call is from the fall of 2006. At that time, Ms. Kainer-Cargile inquired as to why her benefits were being terminated as she had been told her working didn't matter because her benefits were from her deceased father's earning record. The woman at the office, Ms. Faulkner, explained that earning from working could always affect whether one could receive a disability payment. The two went on to discuss Ms. Kainer-Cargile's earnings totals – the agency had sent inquiries to her employers. (R. 15).

When Ms. Faulkner asked whether Ms. Kainer-Cargile was disputing her earnings record, she replied:

> no, I'm not disputing it, it sounds about right but my whole thing is that I was told every year when either my mother or I called just to follow up with someone, especially back in tx, that it didn't matter how many hours I worked and stuff bec (sic) I was getting my dad's check, and it would all changed (sic) when I get married, but then just recently a few months back, I got married and called and some lady said it doesn't matter if im married or not it's the earnings so over the years its up and down, so im just totally lost on what ssi expects you know. . . .

(R. 15).

Ms. Faulkner allowed that Ms. Kainer-Cargile had gotten at least a part of it right. She explained that once she married, she could not receive benefits on her father's earnings record, because "in order to continue to receive benefits as a child, [she] would have to marry a SS disability beneficiary." (R. 15). She could, however, apply for benefits based on her own record. (R. 15-16). And, she would have to have earnings less than the cutoff for substantial gainful activity, which was about $860 per month. (R. 16). Ms. Faulkner said it was too late to stop her next check, but that after that she'd be receiving a letter stating her benefits were terminated. (R. 16). Then she should contact her local office in Aurora, Illinois, if she wanted to contest it or request a waiver of repayment. (R. 17).

But Ms. Kainer-Cargile's benefits did not stop after that last check. So, on November 7, 2006, she called the local office to explain what she had been told, that she was understandably confused, and to ask what was going on. The woman at that office, Lillian, told her that the records showed that she was receiving Social Security benefits. Ms. Kainer-Cargile reiterated that she had been told her benefits had supposedly been terminated. Ms. Kainer-Cargile asked whether it would be best if she came into the

office so things could be straightened out. Lillian assured her that her benefits had not been terminated and there was no need for her to come into the office. (R. 18).

There is one more phone call in the record, from April 24, 2007. It provides an excellent example of what all too many people dealing with a government agency have to endure. After finally being connected to an automated system and being asked to indicate what language she wished to proceed in, Ms. Kainer-Cargile asked to speak with a live operator. She then was taken through a menu of nine options. She requested a live operator once more, and was told she would have to wait for a minute. While she was waiting, she was told that, in order to save time, the system needed her to say her social security number, her first name and its spelling, her last name and its spelling, her date of birth, her mother's maiden name, and the state where she was born. (R. 25-26). After each of Ms. Kainer-Cargile's responses, the system repeated the answer and requested verification. (R. 25-26). When an operator finally got on the line – her name was Jean – she required Ms. Kainer-Cargile to repeat all the information she had just provided in order to save time. (R. 25). In direct contradiction to the information that Ms. Kainer-Cargile was given the last time she called, Jean told her the records showed she had been overpaid about $66,000. (R. 25).

By that time, Ms. Kainer-Cargile was understandably beyond frustrated. She explained that she had gotten too much different information from too many different people, she could only rarely get through on the phone, and she wanted to make an appointment in order to straighten things out face to face. An interpreter was to have been arranged for her, but when she arrived for her long-awaited appointment, the interpreter wasn't there. (R. 136-37).

**The Administrative Hearing Testimony**

At the hearing, Ms. Kainer-Cargile, her husband, and their friend confirmed everything to this point. When Ms. Kainer-Cargile had called the local offices in the past, they had told her she was fine receiving benefits off her father's earnings until she got married. (R. 118, 141). When she dutifully reported that she was soon to be married, her problems began. (R. 118). Ms. Kainer-Cargile added that, she was unaware that her earning the small income she did was inconsistent with receiving benefits off of her father's earnings. (R. 124). Her husband explained that, when the amount of benefits Ms. Kainer-Cargile received fluctuated from time to time, they assumed that was because her income was fluctuating as well. (R. 130). Both Ms. Kainer-Cargile and her husband were operating under the misconception that, because Ms. Kainer-Cargile dutifully reported her income to the IRS, the Social Security Administration would be aware of it as well. (R. 127, 132-33). It's a misconception born of commonsense that the agencies would share information, rather than waiting five or six years while overpayments accumulated.

The ALJ seemed unimpressed. He gave Ms. Kainer-Cargile the file that he was working with to adjudicate her claim. Ms. Kainer-Cargile noticed that the very first page in the file was a document she had never seen before – it was from her brother's file – so she asked about it. The ALJ explained:

> I added it to the record at the last minute because it was an application similar to the one you filed for child insurance benefits. I couldn't find your application but I found his and I just wanted to show you a question on it.

(R. 115). Later in the hearing, the subject came up again. The ALJ said that he:

> looked through the file for your application and to be honest I couldn't
> find it. It may be in there, but there are a lot of papers and I looked and
> looked and I didn't see it, but the one that your brother signed was filed
> with Social Security on November 30, 1998. The record says your
> application was filed on September 15, '97. . . .

(R. 125).

The ALJ then read from Ms. Kainer-Cargile's brother's 1998 application, including the notice that if a disabled child receiving benefits goes to work, he or she must notify the Social Security Administration. (R. 125).

## II.
## THE ALJ'S DECISION

In his decision, the ALJ summarized the hearing testimony. (R. 10). He made no mention of the transcripts of the phone calls Ms. Kainer-Cargile made to the Social Security offices. He said that he "read to them from her brother's application for Child's Insurance Benefits . . . , as I could not find hers in this record, to show the standard language about the need to report earnings from work after age 18 that is contained in all such applications." (R. 11). The ALJ then concluded that Ms. Kainer-Cargile was "not without fault in causing or accepting overpayment" because she "should have known to report earnings when receiving benefits based on disability after age 18 . . . ." (R. 11). Accordingly, he determined that recovery of overpayment was not waived. (R. 11).

## III.
## DISCUSSION

### A.
### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind

might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether a claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

**B.**
**The Law Applicable to Overpayment Cases**

When the Social Security Administration has made an overpayment of disability benefits, the it may not recover an overpayment from the recipient when: (1) the recipient is without fault and (2) "recovery would defeat the purpose of [the Social Security Act] or would be against equity and good conscience." 42 U.S.C. 404(b). According to the regulations governing the implementation of this statutory provision, "[a]lthough the [Administration] may have been at fault in making the overpayment, that fact does not relieve the overpaid individual or any other individual from whom the Administration seeks to recover the overpayment from liability for repayment if such individual is not without fault." 20 C.F.R. § 404.507. A finding of fault can be based on any of the following:

> (a) An incorrect statement made by the individual which he knew or should have known to be incorrect; or
>
> (b) Failure to furnish information which he knew or should have known to be material; or
>
> (c) With respect to the overpaid individual only, acceptance of a payment which he either knew or could have been expected to know was incorrect.

*Id.* In determining whether a person is without fault in causing the overpayment of benefits, the ALJ must "specifically take into account any physical, mental, educational, or linguistic limitation such individual may have (including any lack of facility with the English language)." 42 U.S.C. 404(b); *see also* 20 C.F.R. § 404.507 (same). *See, generally, Wilkening v. Barnhart*, 139 Fed.Appx. 715, 719 (7th Cir. 2005); *Bonner v. Chater*, 1995 WL 272665, 2 (7th Cir. 1995). "'The decision which must be reached in a

fault determination is highly *subjective,* highly dependent on the interaction between the intentions and state of mind of the claimant and the peculiar circumstances of his situation.'" *Begoun v. Astrue,* 2011 WL 307375, 7 (N.D.Ill. 2011); *Jefferson v. Bowen,* 794 F.2d 631, 633 (11th Cir.1986) (quoting *Harrison v. Heckler,* 746 F.2d 480, 482 (9th Cir.1984)).

## C.
## Analysis

The ALJ's decision was a brief one, but there is more than one problem with it. First and foremost, the entire decision – that Ms. Kainer-Cargile ought to have known she had to report that she was working – is based on a notice in her brother's application. There is no evidence that Ms. Kainer-Cargile ever saw any such notice. As such the ALJ had no basis for finding that she was made aware of the reporting requirements. *See Begoun*, 2011 WL 307375, 9 ("There is no evidence in the record, however, that the August 23, 1996 letter actually was sent to Claimant at his then-current residence or that he received it."). As such, substantial evidence does not support the ALJ's finding that she should have know she had to report that she was working, no matter how meager her income.[1]

---

[1] To support the ALJ's decision in this case, the Commissioner relies on evidence that the ALJ did not mention and, according to the ALJ himself, did not even see. (*Defendant's Response*, at 5). This is yet another in a long line of instances in which the Commissioner violates the *Chenery* doctrine. *See, e.g., Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013); *Hughes v. Astrue*, 705 F.3d 276, 279 (7th Cir. 2013); *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012); *Spiva v. Astrue,* 628 F.3d 346, 348 (7th Cir. 2010). The Seventh Circuit has characterized this tactic as "sanctionabl[e]." *Hughes v. Astrue*, 705 F.3d 276, 279 (7th Cir. 2013). The ALJ's only basis for his decision was Ms. Kainer-Cargile's brother's application. The only other evidence he mentioned was the hearing testimony, which ran counter to his conclusion.

Second, although the ALJ summarized the hearing testimony, he did not say whether he found any part of it credible or disbelieved it in its entirety. One may suppose that he disbelieved everything Ms. Kainer-Cargile, her husband, and their friend said, since he found the way he did. But he gave no explanation for it, and he was required to. The reasons for a credibility finding must be expressed, not implied. *Golembiewski v. Barnhart,* 322 F.3d 912, 916 (7th Cir. 2003); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 788 (7th Cir. 2003). Here, the ALJ provides absolutely no rationale that would allow a court to engage in a meaningful review of his decision. That means this case must be remanded. *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012)(". . . ALJ [must] explain[] his analysis of the evidence with enough detail and clarity to permit meaningful review."); *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009)(". . . if the decision . . . is so poorly articulated as to prevent meaningful review, a remand is required.").

Third, and this impinges on credibility as well, the ALJ made no mention of the phone call transcripts. An ALJ does not have to mention every piece of evidence in a record, but he cannot ignore evidence contrary to his conclusion. *Arnett*, 676 F.3d at 592; *Golembiewski*, 322 F.3d at 917. The transcripts were important in this case – and essentially contrary to the ALJ's findings – because they corroborated all the hearing testimony. What is more, they shed a very favorable light on Ms. Kainer-Cargile's credibility and her subjective belief and state of mind. She inquired time and again about her case and received varied information. Her story is that she was only aware that she had to report she was getting married. She thought that once she did, her benefits would cease. And she reported it. When she told that her benefits were not terminated and

everything was fine, she nevertheless followed up because of all the confusion she had been subjected to. That is not the action of a person intent on gaming the system. Such a person would take the money and run. Ms. Kainer-Cargile acted in what certainly appears to have been an innocent and honest manor. But the ALJ ignored all this and, in so doing, he completely – and inappropriately – disregarded the subjective component of the determination of fault. *See Begoun*, 2011 WL 307375, 9; *Bosnich v. Astrue,* 2009 WL 2241803, at *6–7 (N.D.Ill.2009); *Lozano v. Apfel*, 1999 WL 731702, 4 (N.D.Ill. 1999); *Besbeas v. Chater,* 898 F.Supp. 630, 632 (N.D.Ill. 1995).

Finally, the ALJ gave no consideration to the fact that Ms. Kainer-Cargile is deaf. As already noted, an ALJ must "specifically take into account any physical, mental, educational, or linguistic limitation such individual may have (including any lack of facility with the English language)." 42 U.S.C. 404(b); *see also* 20 C.F.R. § 404.507 (same); *Wilkening*, 139 Fed.Appx. at 719; *Bonner*, 1995 WL 272665, 2. Here, some of the difficulties Ms. Kainer-Cargile had are apparent from the record, such as navigating the automated phone system and trying to get an appointment with an interpreter. Other than noting that there was a sign language interpreter at the hearing, the ALJ made no mention of Ms. Kainer-Cargile being deaf, and failed to consider any impact it might have had on her Odyssey through the Social Security bureaucracy.

Ms. Kainer-Cargile asks that, above and beyond a remand, the court simply determine she was without fault and that it would be inequitable to force her to pay back the $66,000 overpayment she received. This, of course, cannot be done. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 356-57 (7th Cir. 2005). The court's task is to review the ALJ's decision, not render its own decision on the evidence.

## CONCLUSION

The plaintiff's motion for remand [#25] is GRANTED, and the Commissioner's motion for summary judgment is DENIED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 10-10-13